**BUSCH v WAGONER et**

Ohio Appeals, 2nd Dist, Montgomery Co

No 1662. Decided Jan 29, 1941

Jacobson &.Durst, Dayton, for plaintiff-appellee.

McConnaughey, Demann & McConnaughey, Dayton, for defendant-appellant.

## OPINION

By BARNES, J.

The above entitled cause is now being heard de novo by reason of defendant's appeal on questions of law and fact from the judgment of the Court of Common Pleas of Montgomery County, Ohio.

The original action was filed in the Common Pleas Court June 24. 1935, during the time when the Miami Savings & Loan Company of Dayton, Ohio, was in charge of the Superintendent of Building & Loan Associations for liquidation.

Since the action was filed, there has been substitutions of defendants; first,, to a successor superintendent and thereafter to the Miami Savings & Loan Company by reason of the fact that the association was returned to its own entity for purposes of liquidation under the supervision of the superintendent.

Through the prayer of plaintiff's amended petition, he seeks an order of the court declaring that account No. 649 with the defendant association be declared a special deposit account in the sum of $3574.90 and that the association be ordered to correct its record accordingly.

On the records of the Building & Loan Association account No. 649 was entered as a running stock account.

The trial court determined that to the extent of $1000 the account should remain a running stock account and in the sum of $2574.90 a special deposit account. Neither side was satisfied with the determination of the court, and both gave notice of appeal on question of law and fact.

The plaintiff failed to support his appeal by giving bond, and the association did give bond and thereby perfected its appeal. In order to have an understanding of the controversy, it is essential that certain facts be stated.

. Plaintiff, Clarence Busch, had been a depositor with the Miami Savings & Loan Company for more than thirty years.

In 1911, when plaintiff was eleven years of age, his mother took him down to the association and made his first deposit in the sum of $1.00, the association giving him a book in which the amount was entered. This was a special deposit and was given No. 5070. Deposits continued in varying amounts

with some withdrawals until the book was filled, the last deposit being made December 30, 1920, and then totaling $2899.00. There is a stamp on this last page of the book opposite the total, indicating that an audit was made in January, 1923. It is admitted that at all times the account in this book was a special deposit account. The books of the association disclose that on January 18, 1924, the account was transferred to a running stock account, the amount of the deposit being $3181.72. Following the filling up of special deposit No. 5070, the later passbooks are not in evidence until No. 649, the first deposit in which is dated June 30, 1930.

In the interim between 1920 and 1930 there probably was one or two passbooks, but they could not be found. Plaintiff says that he had one, and that it was turned back to the association when he received his present book in January, 1930. The association in support of its claim that the present account is a running stock account presents evidence as follows:

Defendants' Exhibit No. 1 purports to be a subscription for ten shares of stock of the association, subject to the constitution, by-laws, rules and regulations, etc. It is signed by Clarence Busch, 2507 East Third Street, and dated January 18, 1924.

Defendants' Exhibit No. 2 purports to be a check of the association issued on the same day to Clarence Busch for $3181.72 and is endorsed in blank.

Exhibits 3, 4 and 5, similar in substance, but bearing different dates, purport to be receipts for withdrawals from account No. 649 and contains in heavy type the words: "The above amount which has been changed to my running stock account No. 649.".

It was also put in evidence that after the transfer to a running stock account dividends were paid at the rate of 6 per cent, whereas previous thereto interest was paid at the rate of 5 per cent.

Plaintiff testifies that he never intended to transfer his account from a special deposit to a running stock account; that the signature on the subscription card was obtained for the stated purpose of having his signature; that he has no recollection whatever of receiving a check, although his signature appears thereon by way of endorsement.

Previously, we have had before us a number of cases of this same character not only involving the present association, but numbers of others in the City of Dayton. In this case, as in all others, it is apparent that depositors, and in many instances employees of the association, had very little if any understanding as to the difference between a special deposit account or a running stock account. So far as the manner of handling the accounts and the withdrawals therefrom, very little difference was manifest so long as the associations were functioning as going concerns. When financial distress brought about the closing of these associations, and later placed them in the hands of the Superintendent, a vital question then arose as to the rights of holders of stock certificates or running stock passbooks. No care was taken to disclose the character of the account through the passbook placed in the hands of the customer. In the instant case the passbook which covers the present account, No. 649, on its outer cover is marked, "Savings Account". Nothing on the inside of the account discloses its character, except in one instance we find noted with a stamp, "Div. Dec.," which we assume means dividend for December.

We would not feel so deeply concerned in these actions if they were in their effect solely between the customer and the association.

In reality they vitally affect the rights of every other customer, whether holding special deposit account or running stock account. Counsel in their brief have referred us to other

cases, which we have decided and have urged pro and con the application of the particular case claimed to be parallel and determinative. While there are certain similarities in some of the facts, yet no two cases are identical on the factual question. It naturally follows that each case must be determined upon its own particular facts. We arrive at the conclusion, considering the record in its entirety together with the exhibits introduced in evidence, that plaintiff subscribed for ten shares of stock of the face value of $1000.00. As to this amount no relief may be given the plaintiff.

The subscription cards signed by the plaintiff make reference to the constitution, by-laws, etc., of the association, and it becomes necessary to look to these by-laws in order to determine whether or not the signing of the original subscription for ten shares would automatically affect the balance in the account then existing, or subsequent deposits. The particular language in the subscription cards reads as follows:

"I hereby agree to and authorize the increase of said shares from time to time as provided for in section 13 of the by-laws of said association."

Section 13 of the by-laws reads as follows:

"When payments and the dividends thereon shall together equal the face value, a certificate of fully paid up stock may be issued therefor or the holder then may authorize the company to increase the shares."

The above quoted provision of Section 13 of the by-laws differs very materially from the provisions in by-laws of other associations which we have previously had before us. As we construe this provision, it requires affirmative action on the part of the holder of the account in order to authorize the association to increase the shares.

No claim is made that any such authorization was given, other than the completed transaction on January 18, 1924.

Counsel for the association urge that the receiving of the check by plaintiff and the transfer of the entire account from the books of the association and the continued receiving of dividends by the plaintiff would constitute the authorization to make the transfer of the entire amount. Of course, the plaintiff would not be bound by the entries made on the books of the association, since these would not be available to him He would be bound by his signing the subscription card for ten shares, and we have already so held.

The endorsing of the check given by the association to the plaintiff on the same day for the full amount of his account would not mean anything, since this action on the part of the association might have been understood by the plaintiff as their method of placing to his credit the subscription for ten shares of stock. Neither would the fact, if it be a fact, that the entire amount was placed in one deposit book be construed as an affirmative action on the part of the plaintiff to automatically increase his stock holdings. Under by-laws requiring no affirmative action, a different question would be presented. In the instant case where the by-laws require affirmative action, it is inconceivable that plaintiff signed a subscription card for ten shares if it was the intention that his entire account was to be in the same classification. Under the situation as we find it the association had the right to transfer to stock ten shares and no more, except by the authorization of the customer.

We arrive at the same conclusion as did the trial court. So much of the account as exceeds $1000.00 should be

changed to a special deposit account, and the association is ordered to change its books and records accordingly.

Costs are awarded against the defendant.

HORNBECK, PJ & GEIGER, J., concur.